UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| NEW SCHOONEBEEK DAIRY, LLC, ) | CASE NO.  09-34327-hcd |
| ) | Chapter 11 |
| ) | |
| 1858 E. 800S ) | |
| La Fontaine, IN  46940 ) | |
| ) | |
| Debtor ) | |

**OBJECTION TO CONFIRMATION OF**
**DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION,**
**DATED JUNE 30, 2011**

Comes now Rabo Agrifinance, Inc. ("Rabo"), a secured and an administrative creditor herein, by counsel, and objects to the confirmation of the Debtor's Second Amended Plan of Reorganization, Dated June 30, 2011 (hereinafter the "Second Amended Plan").  In support of its Objection, Rabo shows the Court as follows:

**I.   Introduction**

New Schoonebeek Dairy, LLC filed these Chapter 11 proceedings on September 8, 2009, and financial statements filed by the Debtor during the case indicate that the Debtor has lost at least the sum of <$719,625.00> through its continued operations.  The Debtor has now filed three (3) proposed plans over the 23 month course of this case, the first two of which were not confirmable as a matter of law. The Debtor's Second Amended Plan proposes the following treatment for Rabo's claims:

1.)    Payment of the principal amount of $2,547,124.79 over 84 months (7 years) at 3.5% interest (a $34,232.98 monthly payment) on Rabo's pre-petition secured claim; and

2.)    Require Rabo to sell to the Debtor the facility owned by Rabo for the payment of $3,750,000.00 over 120 months at 4% interest (a $37,966.53 monthly payment), which payment would also apparently satisfy an administrative claim due to Rabo in the approximate sum of $600,000.00.

1

The Debtor's Second Amended Plan is objectionable because it fails to adequately protect Rabo, is unfeasible and, most importantly, is not confirmable as a matter of law both because it requires Rabo to divest itself of an interest in real estate Rabo owns as an integral part of the Plan and appears to provide for payments to an equity participant of the Debtor during the Plan period in violation of the absolute priority rule.

## II.   Facts Applicable to the Objection

1.   On September 8, 2009 (the "Petition Date"), the Debtor, New Schoonebeek Dairy, LLC ("New Schoonebeek") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition").  Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, New Schoonebeek has retained possession of New Schoonebeek's assets and is authorized, as a debtor in possession, to continue the operation and management of the business previously conducted by New Schoonebeek.

2.   New Schoonebeek's business operations include a dairy operation located in Wabash County, Indiana (the "Dairy").  Assets of the Dairy include dairy cattle, offspring of cattle (collectively, the "Herd"), products of dairy cattle (including milk), feed, equipment, rolling stock, accounts, contract rights and other personal property (collectively, the "Dairy Assets").

3.   As of the Petition Date, Rabo asserted its first priority secured claim against New Schoonebeek and the Dairy Assets in the principal amount of not less than $3,230,392.01 plus interest, and additional fees and expenses (the "Pre-Petition Obligations"), by virtue of, among other things:

   a.   A Credit Agreement, dated May 24, 2006, by and between New Schoonebeek and Rabo in the original principal amount of $3,134,000.00 (the "Credit Agreement");

   b.   An Amended and Restated Credit Agreement, dated July 17, 2007, by and between New Schoonebeek and Rabo in the original principal amount of $3,174,400.00 (the "Amended Credit Agreement");

   c.   A First Amendment to the Amended Credit Agreement dated May 30, 2008 (the "First

        Amendment to the Amended Credit Agreement";

d.   A Second Amendment to the Amended Credit Agreement dated March 6, 2009 (the "Second Amendment to Amended Credit Agreement");

e.   A Herd Line of Credit Note, dated July 17, 2007, incorporating the terms of the Amended Credit Agreement, by and between New Schoonebeek and Rabo in the original principal amount of $2,678,400.00 (the "Herd Note"); and

f.   An Amended and Restated Working Line Capital Line of Credit Note, incorporating the terms of the Amended Credit Agreement, First Amendment to Amended Credit Agreement and Second Amendment to Amended Credit Agreement, by and between New Schoonebeek and Rabo in the original principal amount of $646,000.00 (the "Working Capital Note").

g.   The Obligations represented by the Herd Note and the Working Capital Note are collectively referred to hereinafter as the "Loan".

h.   The loan documents signed and delivered in connection with the Loan include, without limitation, the following:

    i.   The Herd Note;

    ii.   The Working Capital Note;

    iii.   The Credit Agreement, Amended Credit Agreement and amendments thereto referenced above;

    iv.   A Security Agreement, dated May 24, 2006; and

    v.   All other documents and agreements signed in connection with the financing arrangements between Rabo and New Schoonebeek (collectively, the "Loan Documents").

4.   Rabo has asserted that the Pre-Petition Obligations are secured by duly perfected first

priority security interests and liens (the "Pre-Petition Liens") in certain personal property owned by New Schoonebeek including all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, deposit accounts, inventory, equipment, fixtures, farm products, general intangibles, other Dairy Assets and related property as defined in the Security Agreement (the Pre-Petition Collateral"), with priority over all liens, claims, and interests of all other persons and entities including New Schoonebeek.

5. Rabo filed its Proof of Claim in this proceeding on October 14, 2009, the Proof of Claim asserting that Rabo maintained a secured claim against the Debtor in the sum of $3,305,576.10, as of the Petition Date.

6. Pursuant to the Debtor's Emergency Motion for Order Authorizing Use of Cash Collateral and Rabo's filed Objection thereto, an Order was entered by the Court on October 1, 2009, allowing for the use of cash collateral, on an agreed basis. A further Final Order was entered by the Court on November 20, 2010, which Final Order was extended by an additional Order entered on May 6, 2010, extending the use of cash collateral on an agreed basis through July 1, 2010. The Final Order, as extended, has now expired by its terms, but the parties have continued to operate under its general terms as amended by subsequent Court Order.

7. The terms of the Final Cash Collateral Order provided:

> 2. Except to the extent liens exist pursuant to law and such liens were perfected prior to the Petition Date and are not subject to subordination, the liens and security interests granted to Rabo by New Schoonebeek shall constitute first, paramount, enforceable and valid liens upon and security interests in the Collateral.

8. By reason of the premises, Rabo maintains a first priority security interest in virtually all of the personal property owned by New Schoonebeek including New Schoonebeek's farm products (and specifically its livestock), and equipment (collectively, the "Collateral").

4

9. As of August 1, 2011, Rabo continued to be owed the sum of $2,330,502.98 in principal on the Herd Note and the sum of $236,621.81 in principal on the Working Capital Note for a total of $2,567,124.79, each plus additional interest and other charges as the Court shall allow, (the "Total Remaining Indebtedness"), which Total Remaining Indebtedness is fully secured by the Collateral. In addition, Rabo is entitled to its reasonable attorney's fees as part of its balance.

10. As of June 30, 2011, the Debtor reports that Collateral is made up of approximately 1501 cows valued at approximately $1,745.00/per cow for a total of $2,619,245.00; Machinery & Equipment valued for liquidation purposes in the Disclosure Statement to the Second Amended Plan by New Schoonebeek at $250,000.00 and leasehold improvements $50,000.00.

11. The value of the farm products, inventory, equipment and other assets pledge to Rabo total at least the sum of $2,567,124.79, plus other charges and fees due to Rabo.

12. By further reason of the premises, Rabo is a fully secured creditor in this proceeding with regard to the obligations set forth above.

13. On April 29, 2011, Rabo filed its Statement of Transfer of Claim pursuant to BR Rule 3001 (e)(2) detailing that Rabo has been transferred the pre-petition and post-petition administrative claims of Bekel Leasing, LLC ("Bekel Leasing").

14. Pursuant to a Motion made by the Debtor on February 19, 2010 (Document No. 107), and subsequent Order approving the Motion on March 17, 2010 (Document No. 112), Bekel Leasing has been granted an allowed pre-petition unsecured claim in the sum of $75,000.00, an allowed administrative claim for the months of October and November, 2009 in the amount of $110,000.00, an allowed administrative claim for the months of December 2009 and January 2010 in the amount of $16,032, and an additional continuing administrative claim in the amount of $549,055.52 for continued occupancy and rent of the Debtor's business premises. Each of these administrative claims, except for the $110,000.00 allowed claim, are currently in default, and there is a total administrative claim due to

Bekel Leasing of $728,667.83 plus additional rent due and owing form May 1, 2011. Rabo hereby incorporates the Objection of Bekel Leasing filed in this proceeding on March 24, 2011 (Document No. 225), and attaches a copy of the Objection hereto as **Exhibit A**.

15. In summary, Rabo is owed $2,567,124.90, plus additional interest and other charges as the Court shall allow, which sum is collateralized by a first priority secured interest in the Debtor's Collateral (the "Rabo Secured Claim"), and is further owed $728,667.83 plus additional rent due from May 1, 2011 as an administrative claim pursuant to the assignment of the claim from Bekel Leasing to Rabo (the "Rabo Administrative Claim") and a $75,000.00 unsecured claim, again pursuant to the Bekel Leasing assignment (the "Rabo Unsecured Claim").

### III. Proposed Treatment

16. The Debtor's Second Amended Plan proposes to pay Rabo on the Rabo Secured Claim monthly payments over a period of 7 years with interest at a rate of 3.5% per annum.

17. The Debtor's Second Amended Plan further proposes to require Rabo to sell Real Estate owned by Rabo to the Debtor for the sum of $3,750,000.00, payable over 10 years at 4% interest. This sum also appears to satisfy the administrative due to Rabo in the sum of $728,667.83 plus rent from May 1, 2011. Finally, the Debtor's Second Amended Plan proposes to pay 3% of Rabo's $75,000.00 unsecured Claim by the issuance of a Promissory Note due on December 31, 2012.

18. The Debtor's Second Amended Plan proposes that Harry Bekel, the 100% interest holder of the Debtor, convey 80% of his interest in New Schoonebeek to Bel Air Capital in exchange for the infusion of $1,250,000.00 in new capital to retain the current equity structure. Schedules to the Second Amended Plan further appear to provide for monthly "dividend" payments to Bel Air Capital of $13,215.00 per month over the course of the Plan, and do not currently indicate what the additional $250,000.00 over the $1,000,000.00 in cash infused into the Debtor will be utilized for. The Second

Amended Plan does not appear to allow for the "testing" of the value of the conveyed equity interest to Bel Air Capital.

IV.     **Objections Asserted**

Rabo asserts an objection to the confirmation of the Debtor's Second Amended Plan because it may not be confirmed pursuant to the terms of 11 U.S.C. §1129 for numerous reasons.  These reasons include the failure to provide for the adequate protection of the Rabo Secured Claim, the lack of feasibility of the Second Amended Plan, the failure to properly provide for the payment of the Rabo Administrative Claim, the requirement that Rabo divest itself of real estate owned by it, and the violation of the Absolute Priority Rule pursuant to 11 U.S.C. §1129(b)(2)(B)(ii) in prejudice of Rabo's claims.

A.     **Objection Based Upon Lack of Adequate Protection**

19.     Pursuant to 11 U.S.C. §1129 (b)(2)(A), in order for the Court to confirm a Chapter 11 Plan of Reorganization, the Plan must provide:

> **(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> **(A)** With respect to a class of secured claims, the plan provides--
>
> **(i)(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> **(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> **(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> **(iii)** for the realization by such holders of the indubitable equivalent of such claims.

7

20. New Schoonebeek's proposed Second Amended Plan does not provide Rabo with the indubitable equivalent of its claim in that it proposes to pay Rabo the sum of $2,547,124.79 over a period of 84 months (seven years). First, Rabo's claim is in the principal amount of $2,567,124.90, plus interest and fees as allowed. Rabo will seek to be allowed at least $53,192.53 in attorney's fees. Second, the useful life of the Collateral is approximately five (5) years. Third, the Second Amended Plan provides for the payment of interest to Rabo at the annual rate of 3.5%, well below the contract rate and the "*Till*" [1] rate required to be paid under the Bankruptcy Code. There is no reasonable argument for the proposed time or interest rate differential except so as to allow New Schoonebeek to "cash flow" its Plan in the approximate sum of $34,232.98 per month verses the proper payment of at least $51,740.62 per month.

> It is common ground that the "interest in property" referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay. Thus, it is agreed that if the apartment project in this case had been declining in value petitioner would have been entitled, under § 362(d)(1), to cash payments or additional security in the amount of the decline, as § 361 describes.
> *United States Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd*, 484 U.S. 365, 370 (1988)

21. The Second Amended Plan proposed by New Schoonebeek is objectionable because it fails to provide adequate protection to Rabo in that it impermissible lowers the balance due to Rabo; impermissibly seeks to extend the payments to Rabo by a period greater than allowed by law; and impermissibly seek to impose an interest rate lower than allowed by law.

22. As further shown in Section D of the Objections set forth herein, the Second Amended Plan provisions related to the required sale of real estate owned by Rabo to New Schoonebeek also fail

---

[1] *Till v. SCS Credit Corp*., 541 US 465 (2004). The minimum rate of interest provided for should be 4.75%, and given the risk factors, should be required to be a floating rate of at least 1.5% over prime to be confirmable.

8

to adequately protect Rabo's interest in the real estate. This objection will be further discussed in Section D below.

23.     By reason of the premises, New Schoonebeek's proposed Amended Plan does not comply with the provisions of 11 U.S.C. §1129 (b)(2)(A), and should not be confirmed

**B.     Objection Based upon Lack of Feasibility**

24.     Pursuant to 11 U.S.C. §1129 (a)(11), in order for the Court to confirm a Chapter 11 Plan of Reorganization, the Court must find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

25.     It is the debtor's burden to prove its plan is feasible. Case law supports Rabo's position that New Schoonebeek must prove to the Court that its Second Amended Plan will effect a successful reorganization over the life of its plan.

> However, the proponent need show that it provides for a "reasonable assurance of commercial viability." *Id.* A number of factors are pertinent in making this assessment: "the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management, and the likelihood that the same management will continue; and any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan." *In re Prudential Energy Co.,* 58 B.R. 857, 862–63. *See also In re M & S Assoc., Ltd.,* 138 B.R. 845, 849 (Bankr.W.D.Tex.1992); ***343*** *In re Jartran, Inc.,* 44 B.R. 331, 393 (Bankr.N.D.Ill.1984). A bankruptcy judge has an affirmative obligation to ensure that a plan of reorganization is feasible, *M & S Assoc., Ltd.,* 138 B.R. at 848, that it is a plan that has "reasonable assurance" of viability, *LaSalle Partnership, Id.*
> *In Re: Repurchase Corporation*, 332 BR 336, 342 (N.D. Ill. 2005)

26.     New Schoonebeek's June 2011 Monthly Income Statement filed with the Court indicates a cash basis income of $587,622.00 and cash basis monthly expenses of $588,647, for a net monthly cash loss of <$1,025.00>. Likewise New Schoonebeek reports an accrual loss of <$28,664.00> for the

9

month of June, 2011, and a Year-to-Date accrual loss of <$282,670.00>. These losses were incurred without the payment of any debt service except for interest payments due to Rabo under the terms of the previously entered Cash Collateral Orders in the approximate sum of $12,000.00 per month, and without the payment of monthly rent due to Bekel Leasing of approximately $53,000.00.

27.     The Court will recall that a representative of New Schoonebeek testified on June 7, 2011 that the substantial increase in milk prices being experienced during the first six months of 2011 would allow the Debtor's operations to become profitable. That has not occurred even though milk prices have risen from approximately $18.00 per hundredweight[2] in January 2011 to $21.00 in June, 2011 (See chart attached as **Exhibit B**). Milk prices futures indicate that the price of milk will begin descending in the near term, going from a high of $21.49 in August, 2011, to the mid $17.00 range by December, 2011, settling in the mid-$16.00 range by the middle of 2012, and staying at approximately $16.00 through the middle of 2013 (See chart attached as **Exhibit C**).

28.     Historical evidence indicates that the price swings detailed in Paragraph 26 above are not uncommon in the dairy industry, with milk prices reaching highs above $20.00 in 2007, 2008 and 2011, and lows below $16.00 in 2006, 2007, 2009 and 2010. Indeed prices dipped below $12.00 in 2006 and 2009.

29.     The Debtor's Disclosure Statement does not set forth a projected break-even price for milk that it will require during the term of the pay-out to Rabo, however Exhibit G attached to the Disclosure Statement, which Exhibit included projections of cash flow and earnings for the post-confirmation period, indicates continuing cash-flow losses are projected after March, 2012. While the Exhibit indicates that the cash infusion and projected profits from 2011 will allow it sufficient cash to absorb these losses for the near terms, the projections do include a reduction in monthly feed prices from $432,000 in August, 2011 to a monthly average of approximately $380,000 in 2012. This

projected reduction of feed costs flies in the face of corn futures prices however, which indicate a per bushel price of $6.93 in September, 2011, rising to $7.22 or higher by July, 2012 (See chart attached as **Exhibit D**).

30.     Even in the short term New Schoonebeek has difficulty projecting income and expenses, with the June, 2011 projection set forth in Exhibit G to the Disclosure Statement projecting an $86,000 accrual profit, while, as shown above, New Schoonebeek actually experienced a <$28,664.00> loss.

31.     New Schoonebeek's projections in Schedule G further indicate that it expects each cow to produce an average of 72 pounds per day, 365 days per year.  These projections are simply unreliable given environmental stresses at certain times of the year, which are not projected for in the budget.  Indeed, July 2011 was one of the hottest months on record, and environmental stresses can continue to be expected to reduce output.

32.     New Schoonebeek's return to profitability, and the ability to satisfy the proposed treatment of Rabo under the Second Amended Plan, depend entirely on the equity cash infusion of $1,250,000.00 proposed by New Schoonebeek.  Even with this cash infusion, however, projected continuing monthly losses do not demonstrate sufficient reserves to fund Rabo's payments over the 7-10 year payout period.  Rather the projections, even with optimistic values for milk and corn,  call into serious question the ability of New Schoonebeek to perform over the extended Plan period.

33.     In summary, New Schoonebeek has lost money nearly every month of these proceedings while, for the vast majority of the time, only paying approximately $12,000 in interest and no facility rent.  The Second Amended Plan provides that suddenly the post-confirmation debtor is to begin paying $34,292.98 per month in debt service payments to Rabo and $37,966.53 per month in facility payments.  There is simply no evidence that New Schoonebeek can sustain these substantially increased required payments over time.

---

[2] The remainder of the milk prices referenced herein are per hundredweight.

34. As was pointed out in the Court's June 30, 2011, *Memorandum of Decision:*

> The Debtor still has a hard row to hoe. It must demonstrate, in its Amended Plan due July 7, 2011, that it has a realistic ability to reorganize reasonably soon, that it can continue to protect Rabo adequately, and that it can sustain and increase growth in equity.

New Schoonebeek's Second Amended Plan fails to comply with the Court's directive, instead focusing on extending its operations rather than protecting its creditors through a feasible plan. The prospective earnings of New Schoonebeek over the plan's effective 10 year lifespan are very doubtful, especially given volatile market conditions.

35. By reason of the premises, New Schoonebeek's proposed Amended Plan does not comply with the provisions of 11 U.S.C. §1129 (a)(11), and should not be confirmed.

**C.    Objection Based upon Failure to Provide for Payment of Administrative Claim**

36. Pursuant to 11 U.S.C. §1129 (a)(9)(A), in order for the Court to confirm a Chapter 11 Plan of Reorganization, the Court must find that:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--
>
> **(A)** with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

37. As set forth in paragraph 14 above, New Schoonebeek owes a substantial administrative claim to Rabo and, while a portion of the administrative claim ($110,000) had been agreed to be paid over a period of 11 months following the Effective Date of the Amended Plan, there was no agreement that the remainder of the administrative claim could be paid over time. Therefore, an immediate payment would be due to Rabo on the Rabo Administrative Claim in the sum of approximately $618,667.83 plus rent for the months of May through September, 2011. Rabo does not consent to the extension of this payment, and it is clear from

the Debtor's financial records and reports that it cannot fund this sort of payment. Rabo would request a separate order under 11 U.S.C. §1142 for the tender of a confirmation deposit prior to confirmation if the Debtor argues that it can make this payment.

38. New Schoonebeek attempts to avoid the requirement of paying the administrative claim in the Second Amended Plan, however, by declaring that the claim will be folded into the purchase price of the real estate which the Debtor declares that it will purchase with or without Rabo's consent.

39. Rabo objects to the treatment of its administrative claim proposed by New Schoonebeek. Therefore the entire administrative claim amount of $618,667.83 plus rent from May, 2011 through September 2011 would be due upon confirmation. The Debtor's financial reports clearly indicate that sufficient funds are not available to fund this distribution.

40. By reason of the premises, New Schoonebeek's proposed Amended Plan does not comply with the provisions of 11 U.S.C. §1129 (a)(9)(A), and should not be confirmed.

**D.**     **Objection Based upon Violation of Sections 363 and 541 of the Bankruptcy Code**

41. The Second Amended Plan sets forth a requirement that Rabo transfers its fee ownership interest in real estate leased by New Schoonebeek to the Debtor as an integral part of its Second Amended Plan.

42. Currently New Schoonebeek has the right to retain possession of its facilities pursuant to a written lease (as amended pursuant to Agreement approved by the Court) only through September 30, 2014.

43. Apparently New Schoonebeek desires to utilize provisions of 11 U.S.C. §363 to force the "sale " of the facilities owned by Rabo but utilized by the Debtor to New Schoonebeek post-petition. §363 further provides, however:

**(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest

13

in such property of an entity other than the estate, only if--

  **(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;

  **(2)** such entity consents;

  **(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

  **(4)** such interest is in bona fide dispute; or

  **(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.** (Emphasis Added)

44.     Rabo is unaware of any legal or equitable authority which would require it to sell real estate to New Schoonebeek.

45.     The case of In Re: Murchison, 54 BR 721 (N.D. Texas 1985) reviews some of the standards necessary for a debtor to convey property pursuant to §363:

> This application was apparently brought under the premise that the Court had jurisdiction under Code section 363(b)(1), which authorizes the trustee to sell "property of the estate". That term is in turn defined by § 541(a)(1), which states, in pertinent part, that "property of the estate" comprises "all legal or equitable interests of the debtor in property as of the commencement of the case". As explained below, Debtor had no interests in the particular property at issue; rather, he had an equitable interest in the entities which owned other entities, and so on, which ultimately owned an equitable interest in the partnership holding title to the property. Because the criterion of § 541(a)(1) has not been satisfied, § 363(b)(1) cannot apply. **There being no authorization in § 363, or elsewhere, for a debtor in possession or trustee to sell property in which the estate has no interest**, it must be concluded that the application is not based upon any provision in the Bankruptcy Code. . . .
> One may not bring a proceeding in a bankruptcy court to dispose of assets which are not property of any estate and which are being sold and purchased by nondebtors, simply because the selling entity is a corporate relative of a debtor.

*Id.* at 725 (Emphasis added).

46.     Generally stated, before a debtor may force the sale of property under 11 U.S.C. §363 or 11 U.S.C. §1123, the property must be property of the estate. 11 U.S.C. §541 defines property of the estate and states, in part:

**(b)** Property of the estate does not include--

**(2)** any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case.

47.     While Rabo does not contest that New Schoonebeek has a current leasehold interest in the real estate, the interest does not arise to the ability to force the sale of the property, nor will it even exist after the expiration of the lease in 2014. Simply stated, the proposed Second Amended Plan is fatally flawed for even proposing the requirement of the sale to New Schoonebeek. Because this proposed sale is an integral part of the Second Amended Plan however, New Schoonebeek's ability to perform over a seven year time span of the Second Amended Plan is unfeasible.

48.     By reason of the premises, New Schoonebeek's proposed Amended Plan does not comply with the provisions of 11 U.S.C. §§ 1123 and 1129, and should not be confirmed.

**E.     Objection Based Upon Violation of Absolute Priority Rule**

49.     Pursuant to 11 U.S.C. 1129 (b)(2)(B)(ii):

**(B)** With respect to a class of unsecured claims-- . . . .

**(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

50.     The Debtor's Second Amended Plan is significantly different than the first two plans proposed by New Schoonebeek, but continues to provide for the payment to unsecured creditors of 3% of their allowed claims. Under the Second Amended Plan, it appears that Bel Air Capital will contribute $1,250,000 of new capital for an 80% equity stake in New Schoonebeek, but further provides that Harry Bekel, with a 20% remaining interest, shall continue to retain the 20% interest and not be required to contribute any capital. Although he Disclosure Statement does not specifically reference it,

Exhibit G to the Disclosure Statement appears to provide for monthly payments of $13,215.00 to Bel Air Capital[3]. Therefore both Bel Air Capital and Harry Bekel will receive distributions of property under the Second Amended Plan before impaired creditors are paid.

51. Such a provision is a clear violation of the "Absolute Priority Rule" contained in Section 1129.

52. By reason of the premises, New Schoonebeek's proposed Amended Plan does not comply with the provisions of 11 U.S.C. §1129 (b)(2)(B)(ii), and cannot be confirmed.

WHEREFORE Rabo Agrifinance, Inc. prays that the Court deny confirmation of the Debtor's Second Amended Plan of Reorganization, grant relief from stay to Rabo, direct the abandonment of the Collateral and real estate to Rabo, and for all other proper relief.

          Respectfully Submitted,

          KROGER, GARDIS & REGAS, LLP

          By:  /s/ Jay P. Kennedy
             Jay P. Kennedy, #5477-49
             Attorneys for Creditor,
             Rabo Agrifinance, Inc.

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN   46204-5125
(317) 692-9000
(317) 264-6832 Fax
jpk@kgrlaw.com

---

3 Interestingly, the payments would fully amortize the payment of Bel Air at 4.75% interest rate over a 10 year amortization if the transaction would be considered as "exit financing", but in the proposed structure, Bel Air would be fully paid plus control the company which owned the Debtor's leased facility if the Second Amended Plan was approved.

16

**CERTIFICATE OF SERVICE**

      Service of the foregoing was made by placing a copy of the same in the United States Mail, First Class, postage prepaid, or by electronic service to the following this 9th day of August, 2011:

R. William Jonas, Jr.
Hammerschmidt, Amaral & Jonas
137 N. Michigan Street
South Bend, IN  46601

Nancy J. Gargula
United States Trustee
One Michiana Square Building
Suite 555
South Bend, IN  46601-2349

Alex Edgar
100 E Wayne Street
One Michiana Square
RM 555
South Bend, IN 46601

Douglas C. Lehman
Douglas C. Lehman Professional
 Corporation
30 West Canal Street
Wabash, IN 46992

W. David Arnold
Robinson, Curphey & O'Connell
Four Seagate, Ninth Floor
Toledo, OH 43604

                                        By:  <u>/s/ Jay P. Kennedy</u>

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN  46204-5125
(317) 692-9000
(317) 264-6832 fax
jpk@kgrlaw.com